Filed 05/01/25

STATE OF VERMONT

**SUPERIOR COURT**
**ADDISON UNIT**

**CIVIL DIVISION**
**Docket No. 72-4-20 Ancv**

**AERIE POINT HOLDINGS, LLC,**
    **Plaintiff,**

**v.**

**VORSTEVELD FARM, LLP,**
    **Defendant**

**Decision: Motion to Demonstrate Compliance (Motion #42)**

An evidentiary hearing was held on April 24 and 25, 2025, on this post judgment motion filed by Vorsteveld Farm LLC ("Farm") to show compliance with the Injunction in the August 15, 2022 Judgment in the case. Present for the Farm was Gerard Vorsteveld with attorneys Claudine C. Safar and Miles M. Stafford; Vicki and Dennis Hopper were present for Aerie Point Holdings LLC ("Aerie Point") with attorney Merrill E. Bent.

In the Decision of March 28, 2022, the court found that the Farm had committed trespass and nuisance against its downslope neighbor Aerie Point by increasing the volume and velocity of water discharged into two streams that crossed Plaintiff's land. This occurred as a result of the installation of an extensive tile drainage system on the Farm's land resulting in the discharge of concentrated water from 17 discharge points in a manner that caused damage in a number of ways, including erosion of land and deposits of sediment and phosphorous.

The Injunction that issued is as follows:

> Defendant is enjoined from allowing water, and any particles it carries, from flowing from the discharge points of Defendant's drain tile system into the public ditches and culverts westerly of Defendant's land on Arnold Bay Road between Adams Ferry Road and Pease Road.

In Decisions dated January 8, 2024, and September 13, 2024, the Farm was held in contempt for failure to comply with the Injunction. Sanctions in the form of daily fines were imposed but delayed until November 16, 2024, to give the Farm time to come into compliance. On November 14, the Farm filed this motion claiming compliance and this hearing was scheduled. As set forth in the Contempt Decisions, the Farm has the burden to prove compliance by clear and convincing evidence.[1]

---

[1] See legal standards for contempt proceedings in the Decision of January 8, 2024, pages 6-7 and Decision of September 13, 2024, pages 9-10.

1

## Findings of Fact

The court hereby incorporates all of the Findings of Fact in the Decisions on the Motion for Contempt filed January 8, 2024, and September 13, 2024, as if fully set forth herein.

Gerard Vorsteveld testified that following the September 13, 2024 Decision referenced above, he purchased caps and waterproof tape from tile drainage contractor Isaac Van Wyck. On October 30, 2024, he put caps on all 17 of the tile drain system discharge outlets and a bypass pipe. He was helped by excavator contractor Joshua Dubois. They went 15 feet back from the open end of each discharge outlet, cut out a section of pipe several inches wide, removed the cut-out section, put a cap on the newly created end of the drain pipe and fastened it on with waterproof tape, then similarly capped the uphill end of the disconnected section (the 15 foot section that was formerly the end of the pipe) which remained in place, and then packed clay soil into the space from which the cut-out section had been removed to hold the caps in place. It is evident that the purpose was to prevent the water in the tile drain system from leaving the tile drains and flowing downhill into the ditches and culverts. Both Mr. Van Wyck and Mr. Dubois testified that they had no role in deciding what would be done; they did what they were asked to do.

The Farm presented the testimony of Richard Hamlin as an engineer with expertise in aerial photography of land with the ability to identify accurately conditions at specific points on the surface of the earth. He uses high technology drones and other sophisticated equipment. He was hired by the Farm to prepare an image from the air of the places on the ground where the now-capped discharge outlets are located. Relying on the map of the Farm property created by Mr. Bannon showing the location of the 17 tile drain discharge points and bypass pipe, all of which were capped on October 30th, Mr. Hamlin took aerial photographs of the field as a whole and a magnified view at each site in an effort to determine whether any water had escaped. His photographs showed, and credibly proved, that there was no evidence of water at any of those sites, indicating that there had been no blowouts or escape of water from the tile drain pipes near the discharge points as of April 17-18, 2025.

Both before and after his testimony, Mr. Hamlin was in the courtroom and listened to all the testimony of other witnesses. He was then recalled on rebuttal as an expert witness on another subject: whether the plugging of the drains would result in blowouts of water. He had not been engaged by the Farm on that issue and had done no preparation prior to the hearing. As a civil engineer he regularly works with issues concerning movement and control of water at civil engineering project sites. His experience with drain tiles consists of one project on a 30-acre farm where drain tiles were used in conjunction with other technologies to address a ground water issue. He is not familiar with the literature about drain tiles as used by farmers or analyzed by agricultural hydrologists and soil specialists, nor issues regarding plugging them.

He testified about the principles of physics involving water movement, water pressure, and water tables. His testimony was that once the plugged drain tiles filled up with water, the water in the surrounding water table would rise and go above the level of the tiles so that the pressure of the water in the tile walls would be the same as the pressure outside the tile walls,

resulting in stability and no blowouts. In determining that the pressure would be equal inside and outside of the drain tiles, he relied on assumptions that he believed were reasonable based on what he had understood. His assumptions were that the drain tiles were located 4 feet below ground, that 8" pipe, which has a surface area of 50 square inches, was used, and that the downhill slope on the farm fields was a long constant regular slope with a 50-foot change in elevation.[2] He used those figures to determine the amount of pressure being exerted on the tile walls. He also testified that the process used for capping—double capping with an intervening space packed with clay soil—was better than a single cap at the end of the discharge outlet because the pressure on a single cap at the outlet site would be 100 pounds of pressure pushing the cap off (based on 8" pipe), whereas in the severed situation the pressure would be pushing the second cap on, not off. He was not asked to, and did not, testify about the impact of putting clay soil in the space where a section of pipe was removed. His testimony was only that what was done was better than having only one cap at the daylight end of the outlet.

The Farm filed the present motion on November 14, 2024, seeking a finding that it is in compliance because it no longer allows water from the drain tile system to flow from the discharge points downhill into the ditches and culverts. The Farm's evidence shows through multiple photographs, videos, and testimony that since the plugging, the prior pattern of water gushing out of the discharge outlets and flowing forcefully downhill to the ditch and culverts no longer takes place. This period included the months of March and April during which spring thaw occurs. Aerie Point provided no evidence to the contrary. The Farm claims it has satisfied the requirements of the Injunction and is no longer in contempt.

Gerard Vorsteveld does not know how the system will function over time. He does not know if water will collect in the tiles or what will happen in the pipes now that the capping has been done. Both Gerard Vorsteveld and Isaac Van Wyck were surprised that the system has not blown out. Gerard Vorsteveld thought that it could have happened. He has not consulted with anybody to prevent blowouts from happening. He plans to check the outlets regularly. He assumes that if there were a blowout, the water would go downhill. He does not know what he would do if that happened, except make phone calls. On April 7, 2025, he discovered that the plug at outlet #3 had come out. He put it back in and put a concrete block in place. It has not failed again since. He plans to remove the caps if the Injunction is lifted. The Farm has asked permission from the nearby Vergennes-Panton water treatment facility to pump the water from the tile drain system to their facility. There has been communication with the facility within the last month.

The evidence is clear and convincing that the Farm has been in compliance from the completion of the October 30, 2024 work, which took 1 ½ days, to the date of the hearing. Thus, the Farm has shown that no daily fines should be imposed for this period.

---

[2] Isaac Van Wyck testified that he installs tile drain pipes 3-4 feet below ground level. The evidence is that the pipes on the Farm's land were installed at a depth of 3 feet and were 4" in diameter. (See Decision of March 28, 2022, Findings of Fact, page 9). (8" diameter pipes may have been used at the outlets.) The site visit of July 17, 2024, showed that although there was an overall slope, the terrain was variable at specific locations on the approximately 250 acres of land on which drain pipes are installed.

The Injunction is a permanent injunction, and therefore the next issue is whether the compliance steps that were taken are sufficient to show that compliance with the Injunction, which is designed to prevent future nuisance and trespass indefinitely, is meaningful and lasting, as opposed to just temporary. There are three bases for concern about this.

The first is that multiple experts in hydrology and agricultural soils previously testified in this case that plugging the tile drain system was ruled out as a solution for compliance because it would cause blowouts. Their testimony was not only unchallenged, but Gerard and Hans Vorsteveld had agreed. This raises the question of whether what was done in October to plug the system is a viable solution for meaningful compliance with a permanent injunction or whether it is only providing a short-term fix.

The second is whether the opinion given by the expert engineer who testified for the Farm that there would not be blowouts based his opinion on sufficient knowledge of the facts and understanding of the application of the method at the specific site.

The third is whether, given these other concerns, the plugs have been in place for a sufficient length of time for a fair trial of meaningful compliance with a permanent injunction.

Evidence related to these concerns is set forth as follows.

*Prior Expert and Other Opinions Opposed to Plugging the Tile Drains*

At the first contempt hearing, Hans Vorsteveld testified that he and Gerard had consulted experts and concluded that plugging the tile drains was a "dumb idea," as it would blow holes in the field and the water would go downhill and negatively impact Aerie Point. Gerard Vorsteveld testified that they had discussed plugging the discharge points but it was a bad idea because the water would back up and break out and cause erosion. This was consistent with the testimony provided by experts in the field of hydrology as it relates to agricultural soils. Agricultural soil scientist Harold Van Es acknowledged that plugging was an option but did not recommend it for a field of this magnitude because it would require blockage at many locations due to the slope of the field. Hydrologist Dr. Joshua Faulkner, who was familiar with both the Farm property and the literature on plugging tile drainage systems, testified that blocking the tile drains was not a good option because it would require extensive plugging and removal. Dr. Mark Bannon, a civil engineer specializing in wetland restoration, testified that plugging and abandoning the tile drains is prohibited by regulations. Eric Van Wyck, brother and partner of Isaac Van Wyck and the installer of tile drains on this Farm and many others, testified that because of the slope of the fields, plugging would cause water to act like there was a hernia and water would geyser out of the system.

At the compliance hearing, there was no evidence on behalf of the Farm to explain why the opinions and advice of these experts was overcome. There was no evidence to explain the reason that the method chosen—severing out a section of pipe 15' back, double capping, and replacing the removed section with soil—would be effective over time. The evidence was that this was what Gerard Vorsteveld did, but there was no opinion based on knowledge or experience that it would be meaningfully effective. Even Gerard Vorsteveld himself expected that there

4

would be blowouts. Mr. Hamlin testified that what Gerard Vorsteveld did was "better" than simply putting a cap at the end of each discharge outlet pipe, but there was, nonetheless, no testimony that this "fix" would prevent discharges of water from the system over time, either from blowouts in the fields or failure of the capping mechanism.

Gerard Vorsteveld has had to redo one of the plugs that failed. Photos show some foam pushing out past caps at some locations (Exhibits A-24, E-18, K-13, L-15), and appear to show some soil spilling out of the outlets at some locations (Exhibits E-2 & 3, E-16, F-1, F-2, F-3. K-1, L-1, L-3, L-4, L-13), indicating the possibility that capping material and/or soil from the compacted soil segment has been pushed out by water. While these show only a suggestion of a possibility, together with the prior expert testimony, they raise questions about whether what was done is sufficient to constitute meaningful prevention—i.e., for more than a limited time period--of concentrated water from the tile drainage system from bursting out and flowing downhill as it previously did.

At the initial merits hearing and at both contempt hearings, there was considerable testimony from both experts and Farm principals rejecting the idea of plugging the tile drains because of expected negative consequences resulting in downhill flow of water to Aerie Point land that would continue the nuisance and trespass, and yet that is what was done without explanation of why the reasons previously relied on were no longer valid. The opinions were that if plugging was done it would have to be done at multiple locations along the miles of drain pipes, and that has not happened.

*Expert Testimony of Mr. Hamlin*

The only expert testimony at the compliance hearing was provided by Mr. Hamlin. His opinion testimony was credible to the extent it was based on assumed conditions (4' depth, 8" diameter pipes, constant slope, etc.)  It was, however, an opinion based on a model with fixed assumptions. He acknowledged that in applying the principles he used in specific situations, there can be multiple variables affecting outcomes. His opinion was not based on the actual facts with respect to the 113 miles of installed drain tiles that led to the 17 discharge points and bypass pipe on the Farm property[3] because he was not familiar with the particular conditions and characteristics of the tiles and their layout. He had only been to a few outlet spots on the ground in preparation for the mapping task he was hired for and had not examined the capped outlets. He acknowledged that his testimony was based on generalized principles and not project-specific data or experience in the field.

Although overall the land slopes 50 feet downward, there are irregularities in slope in the various farm fields, and the size and depth of the drain tiles apparently do not have the same specifications that Mr. Hamlin used in his model. The discharge outlets are located in a variety of types of locations—some on the edge of fields, some at the base of the property near the ditch, and some at points with surrounding land at different angles of slope. Some discharge outlets are above rocks, while others are half buried in the ground. Mr. Hamlin readily acknowledged that

---

[3] See Decision of March 28,2022, Findings of Fact, page 10. A portion of the tiles drain to the north of Aerie Point land.

actual application of the model he presented could be subject to numerous variables. In short, his opinion was based on a theoretical model with specifications that he assumed and applied rather than on the actual characteristics on the ground of the tiles and outlets in their physical locations. It contrasted with the testimony of Isaac Van Wyck, a tile drainage contractor who installs drain tiles for a living and worked on the Farm's land with Gerard Vorsteveld to install the caps, and who expected that there would be blowouts.

That is not to say that Mr. Hamlin's opinion does not have value, but its value is limited by the fact that it is based on a model with assumptions that may not correspond to what is on and in the ground. His lack of familiarity with the body of literature on the use and removal of drain tiles for agricultural purposes also limits the weight and value of his opinion. In addition, his opinion was based on limited information obtained in court from testimony at the compliance hearing and is at odds with the testimony of other experts and contractors familiar with the Vorsteveld Farm fields.

*Length of Time in Existence*

It is encouraging that the capping done by the Farm successfully worked throughout the spring thaw. This short period of success does not necessarily mean, however, that the Farm is fully in reasonable compliance with the requirements of the Injunction, which calls for permanency. The court has doubts and concerns about whether the work performed will continue to prevent tile drain water from flowing over time in a concentrated manner and with force onto Aerie Point land.

In particular, the photos that show foam and dirt coming out of the former ends of discharge outlets give rise to legitimate concerns about whether the caps will hold or break open, sending a full and rapid stream of water downhill, as formerly occurred. There is insufficient assurance of restraint of the water in the tiles given those photos and, thus, an insufficient evidentiary basis for concluding that it is clear and convincing that the capping work that was done can reasonably be expected to be reliable for more than a short period of time. Gerard Vorsteveld acknowledged that he has already had to make a couple of repairs to date. He testified that he did not know if water can still go into the tiles, or how the system will function now that the ends--and only the ends--are capped, and he did not investigate whether the tiles will collect water in the future.

He did not explain why the Farm chose this method when both he and Hans Vorsteveld previously testified that plugging the system was a bad idea and would cause blowouts. He did not explain why he did not plug the pipes at multiple locations, as recommended by hydrologist Dr. Faulkner and agricultural soil scientist Van Es, rather than just at the outlet points. He testified that he did not know what he would do if there was a blowout or rapid surge of water. While Mr. Hamlin testified that it was unlikely that there would be a pressure differential that would cause blowouts, his opinion was based on general principles and assumptions rather than familiarity with this system. The experts who previously testified against plugging unless it was done at multiple intervals along the system were familiar with the specific tiled land at issue.

6

As the court found and stated in the September 13, 2024 Decision, "[t]he Farm has only undertaken any action at all under pressure and only done the minimum it hoped would be sufficient . . . ."[4] As a consequence, it is reasonable for the court, in applying the clear and convincing standard of proof, to be certain that the compliance undertaken by the Farm is meaningful in relation to the permanency of the Injunction.[5]

Given the evidence, it is possible that the capping that was done will continue to be effective with proper maintenance. It is equally possible that the concerns about this methodology expressed earlier by the experts remain valid and that the plugging that was done will not provide more than a temporary restraint of the tile drain water. It is too early to know for sure. Common sense indicates that, given the strength and unanimity of the multiple opinions advising against plugging unless done extensively--opinions that were relied on for a few years--together with the lack of knowledgeable and reliable evidence about why the methodology that was used will continue to be effective going forward, a longer test period is needed.

## Conclusions of Law

No fines are assessed for the period from November 16, 2024, through April 25, 2025, as there has clearly been compliance during that period.

Throughout the many hearings that have taken place in this case since December of 2021, multiple hydrology and agricultural soil experts familiar with the Farm fields, as well as Gerard and Hans Vorsteveld, have testified consistently that plugging the tile drains was not recommended because it would result in blowouts, and if it was done, it should be done at multiple locations along the pipes, not just at the ends. On October 30, 2024, Gerard Vorsteveld plugged the drain pipes close to their discharge ends only. He did so in a manner that had not been discussed before and with no knowledgeable opinion testimony that it would be effective as a long-term solution as applied on the Vorsteveld Farm fields. It is possible that this is an innovative solution that will succeed, as it has during the spring thaw of March and April 2025.

However, there has been no opinion evidence from either experts or persons with field experience that this technique, as applied, represents a sound methodology that provides more than a short-term solution to prevent tile drain water from flowing rapidly downhill due to either blowouts or failure of the caps. There is no explanation from persons with knowledge or experience as to why this methodology overcomes the risks and concerns previously expressed by experts and the owners themselves. Even Gerard Vorsteveld and Isaac Van Wyck are surprised that there have been no blowouts, and the Farm is exploring the possibility of piping the tile drain water to the local waste treatment facility.

---

[4] Decision of September 13, 2024, Findings of Fact, page 8.

[5] Since the Injunction is permanent, if the system fails at any time in the future, Aerie Point may seek enforcement. However, the purpose of the Injunction is to *prevent* failure and the harm that it would entail. Thus, it makes sense to ensure that the compliance work that is done at the outset is sufficient to meet the clear and convincing standard for prevention for more than just a limited period.

Gerard Vorsteveld could not remember how the decision was made to do what was done, who was involved, why the Farm decided to plug the system despite being against it previously as a "dumb idea," or why the specific methodology of severing and double capping should be relied upon as a permanent solution. The only explanation in support of this methodology is the one from Mr. Hamlin, which is based on a model with assumptions that are not based on actual conditions on the ground. The Farm has not provided sound, reliable explanations in support of its work, yet it asks the court to rely on the fact that it capped the discharge points in a manner that has worked for a period of 5 ¾ months with only two months during which the ground was likely not frozen. Despite the apparent success so far, given the solid body of expert opinions over time against plugging unless done at multiple locations and the weakness of the Farm's evidence as to the reason for capping in the manner that was done, the court cannot find that the evidence is *clear and convincing* that what has been done so far is meaningful and reliable compliance with the requirements of an Injunction designed for permanency.

Additional experience over time, as well as additional explanation from persons with knowledge and experience about what will happen with the water in the tile drain system in the Farm's fields year-round, is necessary to meet the burden of proof to show by clear and convincing evidence that the steps taken represent meaningful compliance as opposed to a short-term fix.

Despite the failure to meet the clear and convincing standard, because the Farm took action that has worked so far, its Motion to Demonstrate Compliance is not denied altogether. Rather, more time and testimony are needed to evaluate whether there is clear and convincing evidence that the measures taken so far constitute meaningful compliance. Accordingly, the motion will remain pending and the court will schedule a continued hearing to take place after November 1, 2025. This will provide a full year's worth of experience and opportunity for further analysis of the efficacy of the methodology as a mechanism for meaningful compliance with the Injunction. The Farm will have that opportunity to provide more evidence, including hopefully expert evidence (responsive to the overwhelming prior expert evidence), that the clear and convincing standard will have been met.

In the meantime, because of the success so far, the daily fines previously ordered are suspended for the present. The Farm remains responsible for the attorney fees of Aerie Point for having to return to court again.[6] If Aerie Point seeks attorney fees, it shall file a request, supported by time and billing records, by May 16, 2025.

---

[6]See legal basis for attorney fees in the Decision of January 8, 2024, pages 8-9 and Decision of September 13, 2024, page 10.

## Order

Based on the foregoing,

1. The Farm has complied with the Injunction on at least a temporary basis but has not proved meaningful compliance with a permanent Injunction by clear and convincing evidence.

2. Motion #42 remains pending and a continuation of the hearing will be scheduled to take place after November 1, 2025.

3. No fines are assessed for the period from November 16, 2024, to the present. The fines provided for in the September 13, 2024 Order are suspended for the present.

4. Plaintiff Aerie Point is entitled to attorneys' fees in connection with the above Motion. Any request for fees incurred to date must be filed by May 16, 2025, and must be supported by time and billing records. If such a request is filed, Defendant Farm may file any objection within 14 days.

Electronically signed May 1, 2025 pursuant to V.R.E.F. 9 (d).

*Mary Miles Teachout*

Mary Miles Teachout
Superior Judge (Ret.), Specially Assigned